THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES F. HATTERY, Defendant-Appellant.

First District (5th Division) No. 1—87—1252

Opinion filed May 19, 1989.

Sidney I. Schenkier and Richard P. Steinken, both of Chicago (Jenner & Block, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Paula Carstensen, and Nancy Nolan Colleti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COCCIA delivered the opinion of the court:

Defendant Charles Hattery appeals from his conviction for three counts of murder in a 1987 bench trial. He also asks this court to vacate the three consecutive life sentences imposed upon him by the trial judge after a jury, following a separate hearing, declined to impose the death penalty.

In January 1983, the defendant was indicted for murder and armed violence in connection with the killings of Trenette Anderson and her two small children, Albert Anderson, Jr., and Reshonda Anderson, in their Chicago home. A jury found him guilty on both charges and sentenced him to death. On appeal, the Illinois Supreme Court reversed his convictions and vacated the death sentence, find-

ing that he had received inadequate assistance of counsel. The matter was remanded for a new trial. *People v. Hattery* (1985), 109 Ill. 2d 449, 488 N.E.2d 513.

On remand, the case was initially assigned to circuit court Judge James M. Bailey, who had presided over the first trial. Defendant then filed a substitution of judge motion (Ill. Rev. Stat. 1985, ch. 38, par. 114—5(a)), which was denied. However, acting upon defendant's petition, the Illinois Supreme Court issued a supervisory order directing the trial court to grant the motion. The case was then assigned to circuit court Judge Robert V. Boharic. Acting presiding Judge James M. Bailey denied a subsequent motion by defendant for transfer of the case "by random computer assignment" to a judge other than Judge Boharic and those judges already substituted out of the case by defendant's section 114—5(a) motion. He also denied defendant's request for an evidentiary hearing on the "computer assignment" motion. Petitioning the Illinois Supreme Court for a supervisory order relative to this motion, defendant argued that because it appeared that he had not been assigned a trial judge by computer, according to routine court practice, but had instead been assigned a judge by order of the court, he had been deprived of his constitutional rights of due process and equal protection of the laws. His petition was denied, and proceedings continued.

Prior to trial, defendant moved to suppress his written statements to police, contending that they not only were involuntary, but also were the product of a pretextual and illegal arrest. He further claimed that the statements had been obtained as a result of denying him an opportunity to consult with a family member.

Following a hearing, all of defendant's pretrial motions were denied. His written confession was admitted into evidence and the court found him guilty on the three murder counts. Judge Boharic then pronounced a sentence of natural life imprisonment for each of the murders, pursuant to two relevant provisions of section 8—1 of the Unified Code of Corrections, one relating to defendants found guilty of murdering more than one person (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c)), and the other relating to murders accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b)).

On appeal, defendant raises issues pertaining to both his convictions and the sentences imposed. He contends that his convictions for the murders should be reversed for the following reasons: (1) the assignment of Judge Boharic to the case, outside of the random computer assignment system, violated his rights to due process and equal

protection and, therefore, his motion to transfer the case to another judge by computer assignment was improperly denied; and (2) the trial court erred in refusing to suppress his statements to police because (a) the statements were inadmissible as the product of an illegal pretextual arrest, (b) there was no probable cause to arrest him for aggravated battery, the charge upon which he was taken into custody for questioning about the murders, and (c) the statements were the product of the coercive use of a polygraph examination and the denial of parental consultation. Defendant further maintains that, should this court uphold his convictions, his three consecutive life sentences must nonetheless be vacated. He argues that the sentences were improper for any of three reasons: (1) the killings, however tragic, were not characterized by the "exceptionally brutal or heinous behavior indicative of wanton cruelty" required under the relevant statutory provision; (2) the statutory provision relating to sentencing for multiple murders does not require a natural life sentence; and (3) the trial judge exceeded his statutory authority in imposing the three life sentences to run consecutively, rather than concurrently.

As disclosed in the record, the facts surrounding the deaths of the three victims are not complex. In December 1982, Albert Anderson lived with his wife, Trenette, their 22-month-old son, Albert, Jr., and their seven-month-old daughter, Reshonda, in a third-floor apartment at 919 West Sunnyside in Chicago. At about 1 a.m. on December 4, Albert left the apartment and walked to a nearby store to purchase a package of cigarettes for his wife. On his way home, he heard his name called by Rufus Mister, also known as "Smooth." Mister was standing with the defendant about one-half block away. As Anderson approached the two men, Mister began arguing with him about drugs, claiming that Anderson owed him money for some drugs that Mister had purchased from him and that it was Anderson's turn to reciprocate. Rather than continue the argument on the street, Anderson invited Mister and the defendant into his apartment. Once inside, Mister continued his demands, loudly insisting that he wanted some drugs, not just the money Anderson owed him. As soon as Anderson managed to calm Mister down, the two men decided to go out together to look for drugs. Before they left, Anderson overheard part of a conversation between Mister and the defendant. He recalled Mister telling the defendant that if he was not "back in five," he (Hattery) knew "what to do." Then Mister and Anderson set out, leaving Trenette, the two children, and the defendant alone in the apartment.

The men's initial effort to find drugs was unsuccessful, but Mister insisted that they continue the search. Eventually, Mister was able to

make a purchase with some money supplied by Anderson. They returned to the apartment about 6 a.m., accompanied by Mister's girl friend, Kathy Robinson, and two other women. Having forgotten his keys, Anderson knocked repeatedly at the back door. There was no response. He also suspected that something was wrong because a light had been left on. Mister kicked the door in, and they entered the apartment. Passing through the kitchen into the living room, which was in disarray, Anderson noticed some blood on the floor next to the bedroom door. Trenette's body lay across the foot of the bed. She was clothed only in a pajama top, which had been pulled up over her breasts. Next to her on the bed was Albert, Jr. When Anderson picked up his son, he realized that he, too, was dead. Reshonda was in her crib in the same room. Anderson assumed that she was asleep until one of the women picked her up and said, "Oh, my God, not the baby, too." Turning to Mister, Anderson asked him if he had anything to do with it. He seized a small steak knife which was lying on the floor and started toward Mister with the knife. The women stood in his way and urged him to call the police. Anderson ran downstairs and tried unsuccessfully to find a telephone, first at the building's security office, which was locked, then at a nearby service station. Then he returned home.

John Salyers, a Chicago police sergeant, testified that upon arriving at Anderson's apartment building about 6:30 a.m., he was directed to the rear by a man, later identified as Rufus Mister, who was standing on the sidewalk with two patrol officers. The back door of the apartment appeared to have been forced open. Entering the residence with the other officers, he observed Albert Anderson standing in the bedroom, holding a knife in his hands and making stabbing motions toward his own chest. He ordered Anderson to drop the knife, then led him into the kitchen and handcuffed him. Returning to the bedroom, he discovered the bodies of a woman and two small children on the bed. The woman's body was partially nude, and he observed lacerations on both of her wrists, a small mark on her neck, and an injury to her breast area. There were also injuries to the children's necks. Traces of blood were visible on the living room floor. Salyers then ordered one of the officers to handcuff Rufus Mister, who had followed them into the apartment. After calling for a mobile crime lab to be brought to the scene, he arranged for Mister and Anderson to be transported to a police station for questioning.

Dr. Robert Stein, chief medical examiner of Cook County, testified that he performed autopsies on the three victims on December 6, 1982. His examination of Trenette revealed contusions and abrasions

of the head and neck, a superficial incised wound on the left breast, and a number of other cuts to the right arm. Dr. Stein described some of the cuts to Trenette's arm as compatible with defense wounds, or wounds inflicted against a person who is trying to defend himself. His conclusion as to the cause of her death was manual strangulation. Autopsies of Albert, Jr., and Reshonda revealed contusions and abrasions around their necks. Dr. Stein testified that the children's cause of death was also manual strangulation.

Dale Sayset, special agent, Illinois State Police, testified that in January 1983, he was assigned to the Gang Prosecution Unit of the Cook County State's Attorney's office. On January 18, 1983, a telephone call from Troy Hattery, defendant's father, was directed to him by Assistant State's Attorney Greg Owen. Prior to this telephone conversation, he was not involved with the Anderson murder investigation and had no knowledge of defendant. Troy Hattery told Sayset that his son, Charles, wished to speak to the State's Attorney's office about a triple homicide that he had witnessed somewhere on the north side of Chicago. The incident had apparently involved a street gang and caused Charles to fear for his life. The next morning, during a second telephone conversation with Troy Hattery, arrangements were made for Sayset to meet defendant the next day at O'Hare airport. In the meantime, Sayset tried to learn something more about the murders. He was directed to Chicago police detective Chris Grogman, who apprised him of the ongoing investigation. Grogman also informed Sayset of an outstanding aggravated battery warrant for defendant's arrest and furnished him with a copy of the warrant and complaint for the aggravated battery and with copies of police reports on the homicides.

The prearranged meeting with Charles Hattery took place at O'Hare airport on the morning of January 20, 1983. As the defendant arrived on a flight from Texas, he was approached by his father, mother, and sister, Agent Sayset, and Sayset's partner, Agent John Stevens. Sayset recalled that Troy Hattery introduced Sayset and Stevens to defendant as "men that he had spoken to [him] about." Then Sayset discussed the arrangements which had been made for defendant to talk to an assistant State's Attorney. Agents Sayset and Stevens would drive Charles to the State's Attorney's office at 26th and California. Troy, Mary, and Maureen Hattery would drive to that location in their car. Shortly after the two officers and defendant entered the car, Sayset informed Hattery that he was under arrest for aggravated battery and immediately read him his *Miranda* rights. However, the officers made no attempt to discuss any of the crimes

with him. Upon arriving at the State's Attorney's office, the entire family was introduced to Assistant State's Attorney Greg Owen and placed in a large conference room. Sayset took no further part in the investigation, which was handled primarily by Owen and Assistant State's Attorney Timothy McMahon.

Timothy McMahon testified that he first became involved in the Anderson homicide investigation on the morning of January 20, 1983, when he was informed that Charles Hattery was coming to Chicago from Texas and wished to speak to a representative of the State's Attorney's office about that incident. After reviewing some police reports, he and Owen met defendant shortly after noon in the Gang Prosecution Unit offices at 26th and California. After being advised of his *Miranda* rights, Hattery related two conflicting versions of what had occurred in the early morning hours of December 4. He initially stated that Anderson and Mister returned to the apartment after purchasing some drugs. While he was in the bathroom assisting Anderson tie off his arm to inject drugs, he heard nothing unusual in the apartment. However, when he left the bathroom, he discovered that Trenette was dead and Mister was gone. He did not mention seeing any children in the apartment. Anderson and the defendant then fled. He also stated that he was a member of the Black Gangster Disciples gang and the bodyguard of a gang faction leader. After a brief discussion outside the room, McMahon and Owen confronted defendant with some inconsistencies between his story and what they knew of the incident from police reports. He then altered his account, stating that he had heard noises while in the bathroom, and upon leaving that room, had observed Mister strangling Trenette while one of the children sat nearby. When he asked Mister what he was doing, Mister replied that if he did not like it, he could leave. He then fled the apartment and the jurisdiction. The attorneys left the room and spoke to defendant's parents, indicating that there were some conflicts in his explanation which a polygraph examination might clarify. When a polygraph was also suggested to Hattery, he agreed to take the test. During the course of these interviews, McMahon recalled that the defendant's physical appearance and behavior appeared normal, that he communicated well, and that he was allowed to speak to his parents and sister several times. About 2 p.m., defendant was driven to Area 6 police headquarters by several officers.

Sergeant John Schnoor (then a detective) testified that immediately before he and Detective Chris Grogman transported defendant to the police crime laboratory about 4:30 p.m., defendant was again asked if he were willing to take a polygraph test, which had been

scheduled for 5 p.m. He answered that he was. Upon arrival, Schnoor and Grogman turned Hattery over to the polygraph examiner, Thomas Walsh, having first informed Walsh that they considered him a prime suspect in the homicides. After approximately 20 minutes, Walsh called the officers into the examination room and informed them that Hattery wished to speak with them. As soon as they stepped into the room, defendant stated, "I had done it, and I'm sorry I caused you all this trouble." He was immediately advised of his rights and transported back to Area 6 police headquarters. There, he was readvised of his *Miranda* rights before being interviewed by Schnoor and Grogman. During this interview, defendant admitted strangling the three victims and later borrowing $400 at his mother's house before flying to Texas the next day. Schnoor further testified that at no time during the interview did Hattery ask to speak to his father. The aggravated battery charge was not discussed. Following the interview, Schnoor telephoned Assistant State's Attorney William Merritt and requested that he take a signed statement from the defendant.

William Merritt testified that shortly after 7 p.m. on January 20, he interviewed the defendant after Schnoor informed him about the murders and Hattery's inculpatory statements. Schnoor, Merritt, and the defendant were present for the interview. Merritt initially explained that he was not defendant's attorney, but was an attorney assisting the police. He then read defendant his *Miranda* rights, inquiring after each right whether Hattery understood it, and specifically explaining that he could have an attorney free of charge before any questioning began. The defendant responded that he understood these rights. Then he again admitted committing the murders and described the surrounding circumstances. Following the interview, Merritt explained what a court-reported statement was and asked Hattery if he would be willing to give such a statement. Defendant replied that he would.

While waiting about an hour for the court reporter's arrival, defendant told Merritt that he had been treated "fine" by the police and had eaten lunch. Because it was 9 p.m., Merritt sent for the hamburger, fries and milk shake which Hattery requested. In a court-reported statement taken at 10:12 p.m. and before which he was again advised of his constitutional rights, defendant related the following events. Sometime about 2 a.m. on December 4, 1982, as he and Rufus Mister were walking along Sunnyside toward Sheridan Road, looking for Albert Anderson, they spotted Anderson on the street. Following a discussion about drugs, all three went to Anderson's apartment,

where Hattery sat in a living room chair. Albert and Trenette Anderson were in the front room; the two children were in the bedroom. After further discussion about drugs, Albert Anderson and Mister got ready to leave. Mister told Hattery that he should stay in the apartment. If he (Mister) were not back in five minutes, Hattery should kill everyone in the apartment. If he did not do this, defendant and his family would be hurt.

Defendant recalled that he was wearing a digital watch at the time. As soon as the two men left, he "pushed it twice so it recorded seconds." He waited until exactly five minutes had passed in seconds. Then he told Trenette that if he did not take care of what he had to do, he and his family would be hurt. Trenette began screaming. Defendant grabbed her, then pulled out his knife. Her wrist was cut in the ensuing struggle. Then he started choking her. Hattery recalled that it was precisely 3:23 a.m. at the time he choked Trenette because he had pushed his digital watch again, to show minutes. After strangling Trenette Anderson, he undressed her and was about to bring her into the bedroom when Albert, Jr., came running into the front room. Defendant choked the boy and put him on the bed with his mother. Then he went over to the crib, choked Reshonda and left her in the crib. He remained in the apartment for approximately 30 more minutes. During that time, he heard a knock and a woman's voice at the back door, calling for Albert. He replied through the door that Albert was not home, but would be back later. As he left the apartment, defendant placed the knife in his pocket. He later discarded it in a dumpster.

Following Hattery's statement, Merritt asked him if he had come back to Chicago to "turn himself in." Hattery replied that he had. He also replied, in response to Merritt's questions, that he had been treated well while in police custody since 11 a.m., that no one had pressured him to give his statement, and that he gave it "of his own free will and accord." Merritt had defendant read a portion of the statement aloud to be sure that he could read, then had him read and review the remaining pages, which Hattery signed.

A grand jury subsequently indicted Charles Hattery for the murders of Trenette Anderson and her two children. Another grand jury indicted him for an aggravated battery against Daniel K. (Danny) Anthony, the charge stemming from an unrelated incident on December 2, 1982, for which a warrant was obtained by Chicago police and executed upon defendant by Agent Sayset at O'Hare airport. Defendant was arraigned on the aggravated battery charge and a public defender was appointed to defend him. On July 25, 1983, following

Hattery's conviction on the three murder charges in his first trial, and the imposition of the death penalty, the battery charge was dismissed at the State's request.

## THE "COMPUTER ASSIGNMENT" MOTION

Before addressing issues related to defendant's arrest and confession, we will consider his contention that the apparent assignment of his case to Judge Boharic by order of the court, rather than through a customary computer assignment process allegedly in use, violated his constitutional rights. Defendant maintains that Judge Bailey's denial of his motion to transfer the case to another judge by computer assignment, or, alternatively, to grant an evidentiary hearing, was in error.

Defendant filed his "Motion for Transfer of Case to a New Judge by Random Computer Assignment" in January 1987. Four months earlier, defendant had named Judge Bailey, who had presided at his first trial, and Judge Thomas J. Maloney, in a timely substitution of judge motion. (Ill. Rev. Stat. 1985, ch. 38, par. 114—5(a).) This motion was granted pursuant to a supervisory order of the Illinois Supreme Court, thereby precluding the two named judges from hearing the case on remand. On October 10, 1986, presiding Judge Richard Fitzgerald assigned the case to Judge Boharic, with whom defendant filed motions to suppress his statements to police. A hearing on the motions was set for January 8, 1987. On January 5, Judge Boharic denied defendant's request for a two-week continuance. At this point in the proceeding, nearly three months after Judge Boharic had been assigned to the case, defendant presented his "computer assignment" motion to Judge Bailey, then acting presiding judge of the criminal division.

Defendant's motion contained the following sworn allegations: (1) that in 1978, the circuit court of Cook County, criminal division, instituted a policy of assigning cases to judges by use of a random computer assignment system; (2) that a separate computer category of judges exists for the random assignment of "highly sensitive" cases, although "counsel for the defense does not know the identity of these judges or the basis for this special category"; (3) that it recently had come to defendant's attention that there was no computer sheet for his case, indicative of computer assignment, in the court file; rather, there was only a written docket entry indicting an assignment by order of the court; and (4) that he had recently learned that two 1986 cases with virtually identical procedural histories (*i.e.*, murder cases on remand from reversals by the Illinois Supreme Court, with vacated

death sentences, where section 114—5(a) substitution of judge motions had been denied and then granted pursuant to supreme court supervisory orders) had also been assigned to Judge Boharic by order of the court and not by computer.

Defendant's motion further contended that the criminal division, in allegedly deviating from the random computer assignment system in his and certain other capital cases, violated his rights to due process and equal protection under the law. It specifically requested the court to (1) transfer his case from Judge Boharic to a judge selected by random computer assignment, after first eliminating Judges Bailey, Maloney, and Boharic from the pool of eligible judges; and (2) in the alternative, grant him an evidentiary hearing for the purpose of adducing evidence on these matters. Judge Bailey, after refusing to recuse himself from ruling on the motion, denied both the motion and defendant's request for an evidentiary hearing. He based his ruling upon his stated belief that pursuant to circuit court rule, the presiding judge has complete discretion in assigning judges to cases as he deems appropriate and is not under any obligation to assign them by computer. Defendant then petitioned our supreme court for a supervisory order vacating Judge Bailey's ruling. The supreme court denied defendant's motion in an order which recited neither findings nor rationale. We therefore consider, on review, the issues raised by the "computer assignment" motion.

■ As a preliminary matter, we find that Judge Bailey acted properly in not recusing himself from ruling on the motion. Defendant contends that he was entitled to a ruling by someone other than a judge already substituted out of the case by his previous section 114—5(a) motion. However, even if we were to characterize defendant's motion as a proper motion for substitution of judge for cause, which for reasons set forth below, we do not, the case law interpreting such motions does not support defendant's contention. Section 114—5(d) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 114(d)) provides that upon filing a motion for substitution of judge for cause, supported by affidavit, a hearing shall be conducted as soon as possible by a judge not named in the motion. Defendant's motion before Judge Bailey named Judge Boharic as the judge to be substituted. In a previous decision, this court held that a judge previously substituted out of a case under section (a) of the statute acted properly in ruling upon a subsequent motion for cause in the same case. We found support for this holding in the general rule that a judge who has previously been substituted from a case may perform ministerial functions concerning that case as long as the action taken

has little or no direct relation to the merits. (*People v. Washington* (1984), 121 Ill. App. 3d 479, 484-85, 459 N.E.2d 1029, 1034.) Defendant's "computer assignment" motion had no direct relation to the merits of defendant's murder trial. Therefore, even if the motion were a section 114—5(d) motion for cause, Judge Bailey would not be precluded from ruling on it.

█ In briefs submitted to this court, defendant cites cases interpreting section 114—5(d) as authority for the premise that an evidentiary hearing on his motion should have been granted, although the motion itself nowhere refers to that statute. A defendant moving pursuant to section 114—5(d) to substitute a judge for cause has the burden of showing prejudice on the part of the judge which disqualifies him from sitting on the case. (*People v. Washington* (1984), 121 Ill. App. 3d 479, 485, 459 N.E.2d 1029, 1035.) As defined in prior opinions of this court, "[p]rejudice is a condition of the mind that imports the formation of a fixed anticipatory judgment as distinguished from opinions which yield to evidence." (*People v. Winchell* (1977), 45 Ill. App. 3d 752, 756, 359 N.E.2d 487, 490, quoting *People v. Robinson* (1974), 18 Ill. App. 3d 804, 807, 310 N.E.2d 652, 655.) The burden rests not upon the court to justify retention of the case, but upon the defendant to offer evidence that prejudice will result if his motion is not granted. (*People v. Trolia* (1982), 107 Ill. App. 3d 487, 499, 437 N.E.2d 804, 813.) Defendant made no allegations of prejudice on the part of Judge Boharic in either his written motion or at a brief hearing before Judge Bailey. Nor did he clearly set forth the reason for any prejudice alleged, as required. (*People v. Covington* (1981), 92 Ill. App. 3d 598, 602, 416 N.E.2d 61, 64.) He never supported an allegation of prejudice with an affidavit, as required by the plain language of the statute. In short, defendant's "Motion for Transfer of Case to a New Judge by Random Computer Assignment," filed almost three months after he was aware of Judge Boharic's assignment to his case, yet alleging no prejudice and supporting no such allegation, was not a proper motion for cause pursuant to section 114—5(d) and cannot be considered one for purposes of review.

█ Defendant nonetheless maintains that because his allegations regarding a computer assignment system and the assignment of his case outside the system were set forth on oath in his motion, they must be taken as true. He contends that Judge Bailey erred in denying him an evidentiary hearing at which to demonstrate the truth of his assertions. He further suggests that the appropriate course would be for this court to remand the case for an evidentiary hearing on the motion. In support of his contentions, defendant relies upon two Illi-

nois appellate decisions interpreting section 114—5 motions. (*People v. Ethridge* (1966), 78 Ill. App. 2d 299, 223 N.E.2d 437 (where judge denies a hearing on the motion, defendant's sworn allegations that he could not receive a fair trial must be accepted as true); *People v. Harston* (1974), 23 Ill. App. 3d 279, 319 N.E.2d 69 (reversible error to deprive defendant of hearing on a motion for substitution of judge for cause).) As defendant's motion was not a motion for cause, alleging prejudice, defendant's reliance upon these cases is misplaced. Similarly, a Federal case reversing the dismissal, pursuant to the Federal Rules of Civil Procedure, of a statutory civil rights claim is not controlling here. (*Durso v. Rowe* (7th Cir. 1978), 579 F.2d 1365 (inmate's claim that his due process rights were violated where prison custom and practice relating to work-release revocations were not followed in revoking his work-release privileges improperly dismissed as a matter of law for failure to state a claim pursuant to 42 U.S.C. section 1983 without prior evidentiary hearing).) We therefore conclude that Judge Bailey acted properly in ruling on the motion before him without permitting a prior evidentiary hearing on defendant's allegations. The motion having been heard and denied, our supreme court declined to issue a supervisory order vacating that ruling. We now hold that, on the merits, Judge Bailey did not err in denying defendant's motion. Our reasons follow.

█ Initially, we note that this court, sitting in review, is no more obliged than was the court below to accept the allegations in defendant's motion as true. However, solely for the sake of analysis, we will assume the existence in the criminal division of a customary random computer assignment system. We will likewise assume that defendant's case and two other procedurally similar capital cases were assigned to Judge Boharic by order of the presiding judge and not by computer.

The Illinois Constitution provides that the "[g]eneral administrative and supervisory authority over all courts is vested in the Supreme Court and shall be exercised *** in accordance with its rules." (Ill. Const. 1970, art. VI, §16.) Subject only to the authority of the supreme court, the chief judge in each circuit has the general administrative authority over his court. (Ill. Const. 1970, art. VI, §7(c).) Supreme Court Rule 21(b) gives the chief judge authority to enter general orders, including orders for the assignment of judges. (94 Ill. 2d R. 21(b).) More specifically, General Order No. 17 of the circuit court of Cook County (Cir. Ct. Gen. Order No. 17.2(a)) provides that the presiding judge of the criminal division has general administrative powers within the division, including the assignment of cases to

judges sitting in the division. On October 10, 1986, Judge Richard Fitzgerald was presiding judge of the circuit court of Cook County, criminal division. His authority to assign defendant's case to Judge Boharic flowed directly from the provisions of the Illinois Constitution, supreme court rule, and order cited above. (See *People v. Joseph* (1986), 113 Ill. 2d 36, 46-48, 495 N.E.2d 501, 507.) Other than those which may issue from the supreme court itself, these provisions place no restrictions or limitations upon the presiding judge's authority to assign cases or upon the method of case assignment. A presiding judge may personally assign judges to individual cases, or may use, at his discretion, administrative tools such as computers to facilitate efficient court administration. Here, Judge Fitzgerald issued a direct order, pursuant to his authority under Illinois law, assigning a judge to defendant's case. Defendant then filed his motion requesting Judge Bailey to transfer the case to another judge, by another administrative method, and not for cause as permitted by statute. Judge Bailey acted properly in refusing to grant this motion, which would have directly countermanded a presiding judge's order.

■ Defendant maintains, however, that his due process rights were violated when his case was assigned by order of the presiding judge rather than by one of two random computer assignment methods which he alleges are customarily used by the criminal division. In addressing this contention, the threshold question is whether defendant, by the action of State judicial officials, in this instance, was deprived of a protectable liberty or property right without due process of law. In order to ascertain whether State action violates due process, a court must make two inquiries. First, it must identify a life, liberty or property interest within the meaning of the due process clause (U.S. Const., amend. XIV). Second, it must determine the degree of process due the individual before he can be deprived of that interest. (*Shango v. Jurich* (7th Cir. 1982), 681 F.2d 1091, 1097.) The Illinois Supreme Court has held that a fair trial is a fundamental right in all criminal prosecutions. A violation of this right is a denial of the procedural due process guaranteed litigants under both the United States and Illinois (Ill. Const. 1970, art. I, §2) Constitutions. (*People v. Williams* (1988), 124 Ill. 2d 300, 308, 529 N.E.2d 558, 561.) While due process requires a fair trial in a fair tribunal, before an impartial judge, a litigant does not have the right under due process to have his case heard by a particular judge. (*People v. Williams* (1988), 124 Ill. 2d 300, 308, 529 N.E.2d 558, 561; *United States v. Keane* (N.D. Ill. 1974), 375 F. Supp. 1201, 1204.) Nor does he have a right to determine the manner in which his case is

assigned. *Keane*, 375 F. Supp. at 1204.

■ While defendant concedes that the presiding judge of the criminal division has the authority to assign cases and is not required to establish a random computer selection process or other administrative procedure for doing so, he nonetheless maintains that, having once conferred the "benefits" of a random computer assignment system, the court cannot selectively abandon it. He further contends that his constitutional claim is in no way diminished because the alleged system has not been reduced to a written rule, as due process rights· may spring from an established, yet unwritten, State custom or practice. There is, however, a fundamental flaw in defendant's argument. Our two-step inquiry requires us, first, to identify a substantive liberty or property interest of the defendant, and then, having identified such an interest, to determine what degree of process is due in order to secure it. As we have stated, a fair trial before an impartial judge is a fundamental right of all criminal defendants. However, it does not necessarily follow that the assignment of a judge to a defendant's case by the discretionary authority of a presiding judge, rather than by customary routine administrative procedures, violates this fundamental right. Moreover, while the existence of official practices and procedures is not irrelevant to a determination of whether a protectable interest exists, because a State often provides specific procedures to ensure the realization of a substantive right, a State-created administrative practice or procedure is not itself a liberty interest within the meaning of the fourteenth amendment. (*Shango v. Jurich* (7th Cir. 1982), 681 F.2d 1091, 1101.) As the court in *Shango* stated:

> "Constitutionalizing every state procedural right would stand any due process analysis on its head. Instead of identifying the substantive interest at stake and then ascertaining what process is due to the individual before he can be deprived of that interest, the process is viewed as a substantive end in itself. The purpose of a procedural safeguard, however, is the protection of a substantive interest to which the individual has a legitimate claim of entitlement." *Shango*, 681 F.2d at 1101.

The substantive right to which defendant is entitled, as a criminal defendant in Illinois courts, is that of a fair trial before an impartial judge. We fail to discern how the assignment of one of a set or subset of judges by random computer selection rather than by the presiding judge or by another method serves to secure the fairness of a defendant's trial or the impartiality of the particular judge assigned. The significant benefit of a computer assignment system, if any, is to facilitate the business of a court with a crowded docket and thus promote

efficiency and the expeditious administration of justice. (See *United States v. Keane* (N.D. Ill. 1974), 375 F. Supp. 1201, 1204, *aff'd* (7th Cir. 1975), 522 F.2d 534.) To this end, random computer assignment may be a useful administrative tool in some of our busier courts. However, there inevitably will be times when a mechanical application of routine administrative procedures will be impossible or undesirable due to a judge's case load, the court calendar, or other factors, and will, in the view of the presiding judge, serve to impede rather than advance the furtherance of justice. The presiding judge, having administrative authority over his court, retains the power and discretion to make individual case assignments to any and all judges serving on that court.

This is not to say that our legislature has failed to provide the criminal defendant with numerous procedural safeguards to secure his fundamental right to a fair trial before an unbiased judge. In any criminal trial, a defendant may name one judge as prejudiced against him and move, as of right, for a substitution of that judge. Where the offense charged is a Class X felony or punishable by death or life imprisonment, a defendant may name two judges to be substituted under the same statutory provision. (Ill. Rev. Stat. 1985, ch. 38, par. 114–5(a).) If he then believes that he cannot receive a fair trial from the judge who is subsequently assigned to his case, he may move for substitution of judge for cause under section 114–5(d), provided that he can carry his burden of showing prejudice on the part of the particular judge which disqualifies him from sitting on the case. As we have noted, defendant never alleged bias or prejudice on the part of Judge Boharic at any time prior to or during his trial. If defendant believed the trial judge was biased against him, he should have filed a proper and timely motion for cause pursuant to section 114–5(d). Moreover, having carefully reviewed the entire record in this case, we can only conclude that the judge conducted defendant's trial fairly and impartially, with particular concern for affording defendant every opportunity to present all issues germane to his defense. In short, defendant's fundamental right to a fair trial was not violated by the assignment of Judge Boharic to his case.

■ We likewise find defendant's equal protection argument to be without merit. Defendant contends that for a "class" of three cases, his own and two other capital cases heard on remand in 1986, there was selective, discriminatory abandonment of the alleged court-adopted random computer assignment system. All three cases were initially heard by Judge Bailey, were reversed with death sentences vacated, and subsequently were assigned on remand to Judge Boharic

by order of the court after a substitution of judge motion was granted pursuant to a supervisory order of the supreme court. Even, if for the sake of argument, we were willing to consider three procedurally similar cases heard within a period of more than a year as constituting a class for purposes of equal protection analysis, defendant's argument must fail. Claims of selective enforcement of the laws are appropriately judged according to "ordinary equal protection standards." *(People v. Kail* (1986), 150 Ill. App. 3d 75, 77, 501 N.E.2d 979, 981, quoting *Wayte v. United States* (1985), 470 U.S. 598, 608, 84 L. Ed. 2d 547, 556, 105 S. Ct. 1524, 1531.) Absent the involvement of a fundamental right or a suspect class, neither of which is relevant here, a challenged State action is presumed to be valid and will be sustained where the classification is rationally related to a legitimate State interest. *(People v. Kail* (1986), 150 Ill. App. 3d 75, 77, 501 N.E.2d 979, 981; *City of Cleburne v. Cleburne Living Center* (1985), 473 U.S. 432, 440, 87 L. Ed. 2d 313, 320, 105 S. Ct. 3249, 3254.) However, "the State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *(People v. Kail* (1986), 150 Ill. App. 3d 75, 77, 501 N.E.2d 979, 981, quoting *Cleburne v. Cleburne Living Center* (1985), 473 U.S. 432, 446, 87 L. Ed. 2d 313, 324, 105 S. Ct. 3249, 3258.) The legitimate State interests of judicial economy and effectiveness are served by court administrative practices which govern the work flow in the criminal courts sensibly and efficiently. It is not difficult to conceive of a set of facts which would establish a rational relationship between the "class" of cases allegedly selected out of the random computer assignment process and this legitimate State interest. For example, defendant's motion alleges that a separate computer category, including the names of 8 or 9 of the 33 criminal division judges, exists for "highly sensitive" cases. Defendant further suggests that the three capital cases in his "class" are typical of the "highly sensitive" cases for which such a subset of judges may have been designed, allegedly to ensure assignment of these cases to those judges most qualified to handle them on the basis of special skills or temperament. If we assume for our analysis the truth of these assertions, and if we assume as well that the primary purpose of random computer assignment as an administrative tool is to evenly divide the workload among the various judges in either group, then in the situation where two judges of a subset of eight or nine have already been substituted out of a case by motion, a reasonable approach would be the assignment of the case directly to one of the six remaining judges, in view of the size of the court docket and each judge's case load at the time. We therefore find

that even if all of defendant's allegations were true, the "abandonment" of a customary random computer assignment system in this "class" of cases bears a clear rational relation to the furtherance of legitimate administrative and governmental objectives and is not violative of equal protection.

MOTIONS TO SUPPRESS STATEMENTS

At a pretrial hearing, defendant sought to suppress his confession on four grounds: (1) it resulted from a pretextual arrest on an unrelated charge; (2) it was the product of an arrest made pursuant to an invalid warrant which failed to manifest probable cause; (3) it was involuntary, resulting from coercive use of a polygraph examination; and (4) it was involuntary because it resulted from a denial of parental consultation at a crucial stage of interrogation. In response the State argued that the court was barred from rehearing these issues because they had already been decided by the Illinois Supreme Court in its opinion remanding the case for retrial. (*People v. Hattery* (1985), 109 Ill. 2d 449, 488 N.E.2d 513.) The court below, following a lengthy evidentiary hearing on the suppression motions, found the State's argument unpersuasive and ruled on all issues raised. Under the circumstances of this case, we find that the court did not err in reconsidering these issues on remand.

■ The controlling principles, often referred to as the law-of-the-case doctrine, promote judicial economy by putting an end to the litigation of issues once they have been finally decided by a higher court. (*People v. Lynch* (1987), 151 Ill. App. 3d 987, 993, 503 N.E.2d 857, 861.) Our supreme court has articulated the general rule as follows:

"After a judgment is reversed and the cause is remanded the inferior tribunal can take only such further proceedings as conform to the judgment of the appellate tribunal. *** If no specific directions are given it must be determined from the nature of the case what further proceedings will be proper and not inconsistent with the opinion. *** For the purpose of determining what proceedings the court may take in conformity with the views expressed in the opinion it is necessary to ascertain what the issues are and to examine the opinion of the court which deals with them." (*People v. Lynch* (1987), 151 Ill. App. 3d 987, 993-94, 503 N.E.2d 857, 861, quoting *Roggenbuck v. Breuhaus* (1928), 330 Ill. 294, 297-98, 161 N.E.2d 780, 781-82.)

With regard to pretrial motions to suppress evidence, the rule is that once a motion to suppress has been ruled upon by one judge, that motion cannot be relitigated later before another judge, absent a show-

ing of exceptional circumstances or of additional evidence that has become available since the first hearing to suppress. (*People v. Henderson* (1976), 36 Ill. App. 3d 355, 370, 344 N.E.2d 239, 251.) However, "[i]n a criminal case, where one party is successful in contesting a pretrial order on appeal, reversal and remandment does not preclude the trial court from considering other issues originally raised in the pretrial proceedings but not finally determined by the appellate court on the merits." *People v. Feagans* (1985), 134 Ill. App. 3d 252, 257, 480 N.E.2d 153, 157.

Applying these principles to the case before us, we initially note that the supreme court reversed defendant's convictions and death sentence on the basis of ineffective assistance of counsel during his first trial. Prior to that trial, defendant had filed a motion to suppress his confession on pretextual arrest grounds, arguing that his arrest on an aggravated battery charge was nothing more than a subterfuge to place him in custody for questioning about the homicides. The motion was denied after a hearing at which defendant called only two witnesses, special agent Sayset and Troy Hattery. According to the supreme court, the evidence introduced at the hearing indicated only that (1) defendant's father arranged to have Sayset meet defendant at O'Hare airport; (2) prior to the meeting Sayset learned that there was an outstanding warrant for defendant's arrest; (3) defendant was wanted for questioning with regard to the Anderson homicides; and (4) upon meeting defendant, Sayset arrested him for aggravated battery. The court concluded:

> "The evidence, *without more*, was insufficient to show that defendant was arrested on a subterfuge warrant. A trial court's ruling on a motion to suppress will not be disturbed unless it is manifestly erroneous. [Citations.] *Based on the evidence presented to the trial court*, we cannot say that its ruling on this issue was manifestly erroneous." (Emphasis added.) *People v. Hattery* (1985), 109 Ill. 2d 449, 468, 488 N.E.2d 513, 520-21.

■ At his suppression hearing on remand, defendant called 14 witnesses, primarily in support of his pretextual arrest theory. These included Danny Anthony, alleged victim of the aggravated battery, police officers who conducted investigations leading to the issuance of the arrest warrant and to defendant's questioning about the homicides, officers and attorneys who questioned defendant after his arrest, and three assistant State's Attorneys who denied authorization for the police to seek murder warrants against him. Defendant also presented additional documentary evidence, including police reports

and felony review forms which apparently were not available to defendant's attorneys at the time of his first trial. The court determined, after reviewing a transcript of the proceeding, that this additional evidence had without question never been presented to the first trial court in support of defendant's pretextual arrest argument. In view of the above, we conclude that defendant met his burden of showing additional evidence that had become available since his earlier suppression hearing. Therefore, his motion to suppress his confession on pretextual arrest grounds was properly heard on remand.

■■ Defendant also raised the issue of the validity of the battery warrant during his first appeal. However, the supreme court determined that he had waived that issue, having failed to present any pertinent evidence at his pretrial hearing. (*People v. Hattery* (1985), 109 Ill. 2d 449, 466, 488 N.E.2d 513, 520.) Accordingly, we apply the general rule and hold that this issue, originally raised in prior pretrial proceedings but not finally determined by an appellate court on its merits, was properly heard on its merits by the court below. The remaining issues, relating to the polygraph and parental consultation, were presented for the first time on remand and raise no question of estoppel. We therefore find that the court below did not err in permitting defendant to litigate on remand all of the suppression issues.

■■ On review, we are asked to determine whether the trial court erred in denying defendant's motions to suppress his statements to police. We begin by considering whether the aggravated battery warrant issued for his arrest was a valid warrant under Illinois law. The requirements for valid issuance of an arrest warrant upon complaint are set forth in section 107—9 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 107—9). A complaint must contain the name of the accused, the offense charged, the time and place of the offense, and the signature of the complainant. All of these requirements were met in defendant's case, including a very specific description of the offense committed by him as "aggravated battery," in that he "in violation of the Illinois Revised Statutes Chapter 38 Section 12—3, without legal justification and while armed with a deadly weapon, a baseball bat, intentionally caused bodily harm to Danny Anthony by striking him in the head, back and arm with said baseball bat" on December 2, 1982, at 1120 Sunnyside in Chicago. The complaint was signed by the victim, Danny Anthony, as complainant. The facts alleged in the complaint were attested to under oath as verified by the signature of a Chicago police sergeant designated as a clerk of the court to administer such oaths. Furthermore, under the words "I have examined the above complaint and the person present-

ing the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same," appears the signature of a Cook County circuit court judge having authority to issue arrest warrants. Likewise, the warrant itself meets all statutory requirements and is not facially defective. Ill. Rev. Stat. 1985, ch. 38, par. 107—9(d).

 An arrest warrant may issue only upon a showing of probable cause. The judge issuing the warrant must determine, from the contents of the complaint and the examination, under oath, of the complainant or other witness, that probable cause exists that the person against whom the complaint was made has committed a crime. The judge is not bound by the four corners of the complaint, but may base a determination of probable cause upon his required examination of the complainant or witness. (Ill. Rev. Stat. 1985, ch. 38, par. 107—9(c); *People v. Ross* (1985), 132 Ill. App. 3d 553, 556, 478 N.E.2d 27, 29; *People v. Collins* (1979), 70 Ill. App. 3d 413, 423, 387 N.E.2d 995, 1003.) Moreover, a police officer need not have observed personally the facts that he presents to a magistrate making a probable cause determination; his statements may be based on hearsay. Whether probable cause exists in a particular case turns on the totality of the circumstances and facts known to the officers and the court when the warrant is applied for. The probability of criminal activity is the standard for determining whether probable cause is present, and whether the necessary probability exists is governed by commonsense considerations that are factual and practical. *People v. Tisler* (1984), 103 Ill. 2d 226, 236-37, 469 N.E.2d 147, 152-53.

 Detective Anthony Graffeo of the Chicago police testified at the pretrial hearing that on January 6, 1983, he was provided with a copy of a warrant and complaint and was told by two other detectives that Danny Anthony had come into their police area headquarters and had signed the complaint. He and another officer took these documents to the judge's chambers. Detective Graffeo was asked to relate what information he had given to the judge at the time he presented the warrant. He stated that he had sworn before the judge, an oath, that he had knowledge that Charles Hattery was involved in the beating of Dan Anthony, that the victim had been at Area 6 police offices the previous evening, had viewed several photographs, and had identified Hattery as the person who struck him with a bat during the incident described in the complaint. He told the judge that Anthony had signed the complaint after being sworn in by a police sergeant authorized to act as a deputy court clerk, whose signature appeared on the complaint. He further informed the judge that Anthony had gone to a

hospital for treatment of his injuries after this beating. Graffeo admitted that he had not been present when Anthony was interviewed at police headquarters, and that he based his information on what the other detectives had told him, as well as on the complaint itself. The record reveals that Graffeo also had some personal knowledge of the Anthony beating from his own interviews with Rufus Mister and Albert Anderson, both of whom had been present at the beating and had mentioned it to him on previous occasions. Based on the complaint and the testimony of Detective Graffeo as supported by other evidence in the record, we conclude that the judge issuing the warrant was provided with sufficient information to support an independent finding of probable cause and that the aggravated battery warrant was legally valid.

The trial court also found that, even without a warrant, the police had probable cause to arrest defendant for aggravated battery on January 20, 1983. We believe that the totality of facts and circumstances, as evidenced at the hearing, support this finding. Chicago police officer Steve Janka testified that on December 2, 1982, he responded to a radio call indicating that there was a battery victim at 1100 W. Sunnyside. Officer Janka found Anthony alone in the street, upset and confused with an obvious face injury. He and his partner immediately transported Anthony to a local hospital, where they interviewed the victim. As related in the incident report prepared by Janka, Anthony suffered a contusion to the left side of the face. The victim told police that he was approached on the street by three black males and one white male, 29 to 30 years old, two of whom carried baseball bats. The white male struck him on the side of his face with a bat, then fled with the others. Anthony gave no indication that he knew his attackers by name or nickname. He suggested no possible reason for the attack and did not state that any property had been taken from him. Janka further testified that although he had classified the crime as a simple battery, based on his assessment of the extent of the injury, it was technically an aggravated battery because of the weapon used. After filing his report, Janka did nothing further to follow up on the incident.

Two days later, before Janka's incident report had been disseminated to the rest of the police force, Rufus Mister and Albert Anderson mentioned the same battery incident during routine interviews related to the homicides. They told Detective Graffeo that on December 2, there had been an attack on "Danny" involving Smooth, Al, Cozzi, and Crazy Man, and that Crazy Man had a baseball bat. On January 5, Anderson again mentioned this incident to Graffeo, saying that

defendant, by now identified as Crazy Man, had struck Danny Anthony with a bat. The location of the beating was less than two blocks from the Anderson apartment. Mister (Smooth), Anderson (Al), Cozzi (also known to police) are black; defendant is white. In addition, there is the testimony relating to Anthony's photo identification of defendant at police headquarters on January 5. Sergeant Schnoor testified that after Graffeo had informed him of the information gleaned from the Anderson interview earlier that day, the police located Anthony, who was interviewed later that evening by Schnoor and Grogman. Anthony told the officers that on December 2 he was struck in the head with a baseball bat, and his gold chain and medallion were taken, by a person now known to him as Crazy Man. Schnoor, who was by now familiar with Janka's initial incident report, testified that he showed Anthony a group of 50 photos of white males and that Anthony identified a photo of defendant as the person who hit him with the bat. Schnoor then notified Assistant State's Attorney Christine Campbell, who testified that she conducted a separate interview with Anthony at the police station. On the basis of her interview, Anthony's earlier photo identification of defendant, and her review of the initial police report, she approved the issuing of an arrest warrant for aggravated battery. Schnoor and Grogman then prepared a warrant and complaint, which, according to Schnoor, Anthony signed under oath in his presence and in the presence of a police sergeant who was a deputy court clerk.

Danny Anthony's testimony about the December 2 incident is consistent with Officer Janka's report. However, his testimony differs with respect to what later occurred. Anthony recalled that within two weeks of the beating, police officers, including one from a homicide unit, came to his residence, kicked the door open and asked if he knew someone called Crazy Man. He told them that he did not. After this the police "kept coming around," sometimes "catching [him] on the streets" and "whipping" him. Tiring of this annoyance, he agreed to go to the police station with some officers on the evening of January 5. He recalled the police showing him only one photograph, of a man they identified as Crazy Man. The officers also told him that defendant was wanted on some traffic or drug charges in Texas, and that the police also "had him on some murder warrants," but that the only way they could bring defendant back to Illinois was for Anthony to sign a complaint. Anthony admitted that he signed the complaint in two places, but denied signing it under oath. He also testified that he told both the officers and Campbell that he was not entirely sure that this was the man who hit him. On cross-examination, he stated that

prior to the evening when he signed the complaint he had learned, both from Anderson and other street sources, that the person who had hit him on December 2 was Crazy Man. He also made an in-court identification of the defendant as the person who hit him with a bat and took his chains on December 2, 1982.

After reviewing all the testimony and other evidence, the court credited the testimony of Graffeo and Campbell and disbelieved Anthony's testimony where it differed. The court specifically noted Anthony's demeanor and other factors indicating bias against the police. The court also noted that defendant, who was 21 years old at the time of the battery, appeared to be older than his stated age. It is well established that it is the function of the trial court to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence, and where the evidence is conflicting, to ascertain the truth. (*People v. Mays* (1980), 81 Ill. App. 3d 1090, 1098-99, 401 N.E.2d 1159, 1165-66.) A reviewing court will not disturb a trial court's finding of probable cause unless it is manifestly erroneous. (*People v. Ross* (1985), 132 Ill. App. 3d 553, 557, 478 N.E.2d 27, 30.) Based on our review of the record, we find that the trial court's determination, that probable cause existed on January 20, 1983, to arrest defendant for aggravated battery, was not manifestly erroneous.

Defendant next contends that regardless of any objective validity, his arrest on the aggravated battery charge was merely a pretext used by police to take him into custody for questioning about the homicides. He maintains that the police showed no interest in pursuing the Danny Anthony incident until after the State's Attorney's office had repeatedly denied approval to seek murder warrants for his arrest. He argues that his statements to police, which provided the crucial evidence in this case, were therefore the direct result of a pretextual arrest, in violation of his constitutional rights, and should have been suppressed.

The record discloses that on December 5, 1982, after interviewing Anderson, Mister, and Kathy Robinson about the events of the previous day, police issued a stop order to apprehend defendant for questioning in connection with the homicides. That same day, Detective Graffeo sought approval for an arrest warrant from Assistant State's Attorney Thomas Gainer. Gainer interviewed Graffeo, Anderson, Mister, and Robinson, noting on a felony review form that Mister had told Hattery to "take care of it" if Mister and Anderson did not return to the apartment in 5 to 10 minutes, and that when they did return, Hattery was gone and the victims were dead. Gainer's reason

for refusing to approve the warrant is clearly stated as "no cause of death established; autopsy to be conducted 6 Dec 82." One week later, on December 13, Detective Grogman sought authorization for a warrant from another assistant State's Attorney, David Borenstein. Borenstein testified that after consulting with a supervisor, he rejected the request for lack of probable cause. In his view, police evidence showed only that defendant was the last person to be seen with the victims. Sergeant Schnoor testified that he accompanied Grogman on this occasion and remembered presenting other evidence such as the instruction given by Mister to Hattery before leaving the apartment. He also told Borenstein that there was no forcible entry of the apartment and that since December 4, Hattery's room at the YMCA had been cleaned out and he had never returned there, or to his job, and neither of his parents had seen him. Borenstein stated that no police officer had informed him of these facts, which, if known, would have been recorded on his felony review form.

By January 4, police had uncovered evidence which indicated that defendant had left the State and was possibly in Texas. They presented a third request for a murder warrant to Assistant State's Attorney Christine Campbell, who denied authorization after concluding that there was no evidence directly linking defendant to the murders or clearly substantiating his presence in Texas. Following the third rejection, Sergeant Schnoor testified that he reviewed all the evidence police had gathered to date, hoping to uncover something investigators may have overlooked, including evidence of other crimes defendant may have committed. According to Schnoor, police routinely check into other crimes in which suspects may have been involved, in order to discover their whereabouts and propensity for violence. After reviewing the files, Schnoor contacted Anderson to set up another interview. Schnoor's January 5 memorandum to Detective Graffeo, admitted into evidence, reads in part as follows:

> "ATT: DET. GRAFFEO!!!
>
> Mr. Albert ANDERSON will ask for you when he comes into the office at 0900 Hours. *** Please interview him about any crimes he knows HATTERY committed with an eye to obtaining an arrest warrant for HATTERY based on some *other* crime than this Homicide." (Emphasis in original.)

The subsequent interview with Anderson revealed further details about the Danny Anthony incident, as related above. By the following morning, the aggravated battery warrant had been issued and immediately disseminated nationwide in order to facilitate extradition.

Two weeks later, on January 19, defendant telephoned his father

from Texas. Prior to this call, police investigators had told Troy Hattery that they were interested in questioning his son about a murder, and that they had a warrant for his arrest, but they did not specify the type of warrant. Troy Hattery testified that he informed defendant that detectives wanted to question him about a homicide but told him nothing about a warrant. He told his son to "come back to Chicago and get this issue straightened out." Defendant responded that he would be on a plane arriving the next day. Arrangements for meeting defendant were then made with Agent Sayset.

■■■ It is well established that an arrest may not be used as a mere pretext to avoid the warrant requirement of the fourth amendment. (*United States v. Lefkowitz* (1932), 285 U.S. 452, 467, 76 L. Ed. 877, 884, 52 S. Ct. 420, 424; *United States v. D'Antoni* (7th Cir. 1988), 856 F.2d 975, 979.) This rule has generally been confined to certain narrow circumstances, as where law enforcement officials follow a suspect, waiting for him to commit some minor offense, then arrest him and use the arrest to collect statements or evidence of an unrelated crime. (*United States v. D'Antoni* (7th Cir. 1988), 856 F.2d 975, 979.) Both Federal and Illinois courts have required suppression of evidence gained in this way. (See, *e.g., United States v. Keller* (N.D. Ill. 1980), 499 F. Supp. 415, 418; *People v. Wetherbe* (1984), 122 Ill. App. 3d 654, 659, 462 N.E.2d 1, 5.) However, recent cases interpreting pretextual arrest in the context of circumstances similar to those involved here indicate a clear conflict among the Federal circuits. While the most recent Illinois decisions support the acceptance of certain general principles in this difficult and unsettled area of the law, each case ultimately must be judged on its own facts.

Defendant relies chiefly on two cases, both involving persons arrested on legitimate outstanding traffic warrants and then questioned exclusively about unrelated felonies while in police custody. In *State v. Blair* (Mo. 1985), 691 S.W.2d 259, *cert. dismissed* (1987), 480 U.S. 698, 94 L. Ed. 2d 678, 107 S. Ct. 1596, the defendant was implicated in a murder by an informant. Comparison of a palm print found at the crime scene with palm prints of defendant's family members failed to produce a match, and Blair's print was not in police files. Discovering that Blair was the subject of an outstanding city warrant for a traffic violation, police arrested her at her home, took her directly to a homicide unit, booked her on the homicide charge, and took a palm print. After questioning her about the homicide, she was detained overnight and then released, only to be rearrested on the traffic warrant 15 minutes later. After posting bond on that charge, she was later arrested on a murder warrant police obtained based upon a match of

her palm print with that at the murder scene. The Missouri Supreme Court held that the trial court did not err in suppressing the evidence obtained by police during Blair's initial arrest because "the execution of the parking violation warrant was but a subterfuge or pretext, not pursued, to gather evidence of the unrelated crime of homicide." (691 S.W.2d at 263.) The palm and fingerprints and statements were "properly suppressed because they resulted from an unlawful arrest and search." *State v. Blair* (Mo. 1985), 691 S.W.2d 259, 263.

Defendant also cites *Warran v. City of Lincoln, Nebraska* (8th Cir. 1987), 816 F.2d 1254, in which a panel of the court of appeals, citing *Blair*, initially reversed a district court decision in a civil rights action on grounds that the evidence raised questions of pretextual arrest which should have been submitted to the jury. During the investigation of an attempted burglary, three Lincoln police officers approached Warren as he sat in a parked car in a neighborhood under surveillance by a police tracking dog. The dog had tracked to Warren's car. After requesting some identification, some vehicle ownership information, and a summary of his evening's activities, an officer checked Warren's identification with a dispatcher. Informed of a confirmed warrant for his arrest on speeding and nonappearance charges, she immediately arrested Warren, drove him to the jail complex, and turned him over to a detective investigating a series of burglaries. Warren was given no *Miranda* warnings, was told he had no right to a lawyer when he asked to speak with one, and was denied permission to make a phone call. Questioned intensively about the burglaries, he was fingerprinted and photographed. After less than two hours in custody, he posted bond on the traffic warrant and was released. The *Warren* panel stated that "an arrest ostensibly for one purpose but in reality for the primary purpose of furthering an ulterior goal is unreasonable under the fourth and fourteenth amendments." (*Warren*, 816 F.2d at 1257.) Subsequently, between the time defendant's appeal was filed and the filing of this opinion, the Warren case was reheard by the full Eighth Circuit Court of Appeals, automatically vacating the decision of the panel relied upon here. In their *en banc* decision, the Eighth Circuit upheld the district court's dismissal of Warren's entire claim, primarily on grounds that the police had probable cause to arrest him for burglary, thereby eliminating the pretextual arrest issue from the case without further discussion of the principles involved. *Warren v. City of Lincoln, Nebraska* (8th Cir. 1989), 864 F.2d 1436.

Some obvious distinctions may be drawn between the facts of *Blair* and *Warren* and those of the case at bar, including defendants

arrested for traffic violations rather than for an unrelated felony, the taking of physical evidence inconsistent with routine procedures for traffic-related arrests, and the totally involuntary nature of the arrestees' transportation to police buildings for interrogation about more serious crimes. Nonetheless, both the *Blair* holding and the finding of the panel in *Warren* support the general principle that the motive of police officers in executing a technically lawful arrest for the primary purpose of furthering the investigation of unrelated crimes is a proper subject of inquiry when determining whether a seizure of the arrestee was reasonable.

A contrary conclusion has been reached by the Fifth and Seventh Circuits in recent decisions. The Fifth Circuit Court of Appeals, *en banc*, reversed its own panel on the issue raised here, under similar facts. (*United States v. Causey* (5th Cir. 1987), 834 F.2d 1179.) The court held that the action of police in arresting a bank robbery suspect under an outstanding arrest warrant for a different crime, intending to question him solely about the robbery, did not render his confession inadmissible. (*Causey*, 834 F.2d at 1180.) Although an anonymous informant had identified Causey as the robber of a bank, city police believed that they lacked probable cause to arrest him. Reviewing their files, police discovered a several-year-old outstanding warrant for Causey's arrest for failure to appear on a petty theft charge. After verifying the warrant's validity with the issuing judge, they arrested him on the warrant, gave him repeated *Miranda* warnings, and interrogated him solely about the bank robbery, to which he eventually confessed. The panel had held that although the officers arrested Causey on an admittedly valid warrant, their true and sole intent—to interrogate him about the robbery—rendered his confession inadmissible. (*United States v. Causey* (5th Cir. 1987), 818 F.2d 354, 362-63.) Reversing this decision, the full court held that police conduct otherwise lawful in every respect should not be rendered unconstitutional by irregular subjective intent alone. (*Causey*, 834 F.2d at 1180.) To do so, they stated, would be inconsistent with several United States Supreme Court decisions which stand for the principle that it is irrelevant what subjective intent motivates an officer in taking legal actions, as long as the circumstances, viewed objectively, justify that action. (*Causey*, 834 F.2d at 1182, 1183; see *Maryland v. Macon* (1985), 472 U.S. 463, 86 L. Ed. 2d 370, 105 S. Ct. 2778; *United States v. Villamonte-Marquez* (1983), 462 U.S. 579, 77 L. Ed. 2d 22, 103 S. Ct. 2573; *Scott v. United States* (1978), 436 U.S. 128, 56 L. Ed. 2d 168, 98 S. Ct. 1717.) Although the police may have been motivated to execute a warrant for reasons unrelated to the charged offense, their

execution of that warrant was objectively reasonable. Therefore, in the view of the *Causey* court, there was no reason to apply to objectively authorized acts an exclusionary rule, the purpose of which is to deter unlawful behavior on the part of police. *Causey*, 834 F.2d at 1185.

More recently, the Seventh Circuit Court of Appeals addressed the pretextual arrest issue by applying the same test of objective reasonableness announced in *Causey*. (*United States v. D'Antoni* (7th Cir. 1988), 856 F.2d 975, 979.) The *D'Antoni* case involved a defendant found in the apartment of a drug overdose victim by police responding with emergency aid. Attempting to verify D'Antoni's identity, an officer on the scene ran a routine driver's license check on a police computer, which revealed an outstanding traffic warrant. Based on the outstanding warrant, defendant was placed under arrest and transported to a police station, where he was not immediately booked on the traffic charge. Having been advised of his rights, he was questioned solely about the narcotics matter, answered all questions, and consented to a search of the apartment, where he occasionally stayed. Several hours later, following the search, he was booked on the traffic warrant and released on bond. Later, based on his in-custody statements and evidence discovered during the search, he was convicted of distributing narcotics. On appeal, the court held that the decision of the district court denying suppression of his statements to police and other evidence was not clearly erroneous. Because the officer followed routine procedures in running a routine license check, his action in arresting defendant on the warrant conformed with regular police procedures and irrespective of his motive was objectively reasonable. (*D'Antoni*, 856 F.2d at 979.) The court further found that the detention of defendant for a longer period than it would have taken to book him on the traffic charge was not pretextual, since he did not have enough money to post bond immediately and he voluntarily continued to answer police questions about narcotics. *D'Antoni*, 856 F.2d at 979-80.

Illinois courts have also upheld the admission of evidence where police acted in the ordinary course of investigation and for a proper purpose, despite defendants' claims of pretextual arrests. In *People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360, our supreme court reviewed a case involving a defendant convicted of murder. His arrest had occurred when he was confronted by police at his home after a woman filed a complaint against him for a totally unrelated assault, giving an accurate description of her assailant. Police placed Evans under arrest for this assault and for another felony unrelated to the

murder, and took him to the station, where he later confessed to the homicide. The court found that there was no pretextual arrest where the police went to his home with a fresh complaint for assault in their hands, even though he was arrested by a violent crimes detective investigating the homicide and then questioned about four crimes, including the homicide. It further stated that merely because defendant was in custody for one charge does not preclude the police from investigating other unrelated charges concerning the defendant. *Evans*, 125 Ill. 2d at 72.

In *People v. Anderson* (1988), 169 Ill. App. 3d 289, 523 N.E.2d 1034, the Illinois Appellate Court, Third District, considered the case of a defendant initially suspected of murder and known by police to have a prior record for violent crimes and a suspended driver's license. When Anderson entered his car, police detectives followed behind. When he exited, they asked for his license, which he admitted was suspended. He was immediately arrested on the suspended license charge and taken to the police station for questioning, although neither detective had a ticket book with him and he was not issued a citation upon his arrival. He was informed that a bond was required for the traffic offense and was informed of his *Miranda* rights, but did not ask to place a phone call, obtain bond money, or speak to an attorney. He cooperated with police during the next several hours, eventually confessing to the murder. The trial court found that the officers, substantially deviating from their normal, customary procedures, had arrested Anderson under a pretext to place him in a disadvantageous position where he could be questioned about the murder and granted his motions to suppress his confession. On appeal, the court noted that courts attempting to apply the pretextual arrest doctrine have been forced to inquire into the underlying intent or motivation of the officers "to determine whether some secret, subjective purpose served as the actual basis for arrest," a process that has "led to inconsistent results and often penalized officers who were accused of having bad thoughts even though they outwardly exhibited constitutionally appropriate behavior." (*Anderson*, 169 Ill. App. 3d at 295.) The court referred to the same line of United States Supreme Court cases discussed in *Causey* and stated that while that Court did not expressly renounce the pretextual arrest doctrine in these cases, it did repeatedly assert that "in analyzing alleged fourth amendment violations, an objective assessment of the officer's actions, not his state of mind, is what matters." It further noted that the pretext approach is not the prevailing approach of the Court in determining this type of case. (*Anderson*, 169 Ill. App. 3d at 297.) Finally, the court announced

that it believed it must follow this line of Supreme Court cases and evaluate alleged fourth amendment violations under a standard of objective reasonableness without regard to the officer's underlying motivations. Because the officers had acted with legal authority in arresting Anderson on the suspended license charge, the trial court had erred in granting his motions to suppress his murder confession. *Anderson*, 169 Ill. App. 3d at 299-300.

■■ The question before us is whether the court below erred in denying defendant's motion to suppress his statements on pretextual arrest grounds. It is well established that the decision of the trial court on a motion to suppress will not be disturbed unless it is manifestly erroneous. (*People v. Pierson* (1988), 166 Ill. App. 558, 564, 519 N.E.2d 1185, 1190.) The evidence shows that the Chicago police, while investigating three homicides in which defendant was the prime suspect, interviewed two persons who, in the course of routine investigatory procedures, gave police information relating to defendant's involvement in an unrelated crime at which these persons were also present. Convinced that probable cause existed to arrest defendant for the homicides, police were denied State's Attorney's approval for murder warrants on three occasions. Returning to their files, they discovered the initial incident report of the unrelated crime, a felony, which corroborated the statements of the persons interviewed. They then located the alleged victim of the unrelated aggravated battery, who signed a complaint against defendant, and procured a valid arrest warrant from a judge. Two weeks later, when notified that the defendant was about to voluntarily return from outside the State for the specific purpose of discussing the murders with law enforcement officials, despite his knowledge that he was wanted for questioning on that charge, Chicago police detectives gave the battery warrant to a special agent of the State police, who followed the detectives' instructions in arresting defendant. Despite numerous *Miranda* warnings over a period of 11 hours in custody, he proceeded to discuss the murders with a variety of detectives and assistant State's Attorneys, and with a polygraph examiner, making his first inculpatory statement within approximately five hours of arriving at his first place of custody. While not free to leave during this period, he was offered many opportunities to discontinue questioning and request an attorney. If he had chosen to exercise these rights, he would have been immediately processed on the battery charge, for which he was later arraigned and indicted, although not prosecuted by the State.

We believe, in light of the circumstances confronting him, that not only were Agent Sayset's actions objectively reasonable, but also that

he would have been derelict in his duty had he not arrested defendant with the valid felony warrant in his possession. Moreover, the detectives testified that they followed routine practice in checking into evidence of other crimes, especially violent crimes, which may have been committed by a murder suspect. When that suspect voluntarily returned from outside the jurisdiction to speak with an assistant State's Attorney about the murders, they had him arrested on serious unrelated charges using a valid arrest warrant and questioned him, with his full cooperation, solely about the murders. Under the particular facts and circumstances of this case, we cannot conclude that the trial court's finding, that defendant's confession was not the product of an unreasonable seizure based on a pretextual arrest, was manifestly erroneous.

The trial court also found that regardless of the technical or constitutional validity of his arrest on the battery charge, the police had probable cause to arrest defendant for murder and to detain him for questioning on that charge upon his return to Chicago on January 20, 1983. Section 107—2 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, pars. 107—2(1)(a), (1)(c)) provides that a valid arrest may be made when a warrant has issued, or there are reasonable grounds to believe that the person arrested is committing or has committed a crime. "Reasonable grounds" and "probable cause" are synonymous for purposes of arrest, and the legality of an arrest is tested by the presence or absence of probable cause, not by the presence or absence of a warrant. (*People v. Tyler* (1984), 128 Ill. App. 3d 1080, 1087, 471 N.E.2d 968, 974.) Probable cause exists when the totality of facts and circumstances known to the police would justify the belief, in a person of reasonable caution, that the person arrested has committed an offense. (*People v. Montgomery* (1986), 112 Ill. 2d 517, 525; *People v. Lekas* (1987), 155 Ill. App. 3d 391, 410, 508 N.E.2d 221, 234.) Moreover, information possessed by all officers acting in concert is relevant to a determination of whether probable cause existed at the time of arrest (*People v. Lee* (1986), 151 Ill. App. 3d 510, 518, 502 N.E.2d 399, 404), a principle which has been specifically applied in circumstances where an Illinois State police officer made an arrest based on information supplied by municipal police. (*People v. Smith* (1987), 156 Ill. App. 3d 596, 601, 509 N.E.2d 1345, 1348.) The standard for determining whether probable cause is present is the probability of criminal activity, rather than proof beyond a reasonable doubt. Whether the necessary probability exists is governed not by technical legal rules, but by commonsense considerations that are factual and practical. (*Brinegar v. United States*

(1949), 338 U.S. 160, 175, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310; *People v. Montgomery* (1986), 112 Ill. 2d 517, 525, 494 N.E.2d 475, 477-78; *People v. Tisler* (1984), 103 Ill. 2d 226, 236, 469 N.E.2d 147, 152-53.) A reviewing court will not disturb a trial court's determination of probable cause unless it is manifestly erroneous, and our task on review is simply to ensure that the trial court had a substantial basis for concluding that probable cause existed. (*Tisler*, 103 Ill. 2d at 248.) Based on our review of all the evidence presented, we agree with the trial court that there was probable cause to arrest defendant for murder immediately upon his return to Chicago.

In *People v. Creach* (1980), 79 Ill. 2d 96, 402 N.E.2d 228, the Illinois Supreme Court upheld a trial court's determination of probable cause where, at the time the defendant was taken into custody, the police knew only that Creach had been living with the murder victim for four weeks prior to her death, that she was most likely killed sometime after midnight, that Creach had been the last person known to have seen her alive after midnight and had seen her at 1:30 a.m., 5½ hours before her body was discovered on the CTA tracks, and that he had unexplainedly left for Ohio in the victim's car within hours of her death. After Creach was informed of the victim's murder during a telephone conversation with his mother, the defendant agreed to return home immediately, at which time he was arrested as he approached his mother's residence. While many of the facts and circumstances of the *Creach* case are similar to those of the instant case, the evidence before us even more strongly supports a determination that there was probable cause for Hattery's arrest on murder charges by January 20. At the time he was taken into custody, the police knew that he had been admitted to the victims' apartment and had been left alone with the victims after 2 a.m. while the victim's husband and a companion went out for drugs. Before leaving, the companion had told defendant, "If I'm not back in five, you know what to do." When the husband, the companion, and two women returned to the apartment about 6 a.m., they found the victims dead and saw no sign of defendant. A later police investigation revealed no forced entry of the apartment. Furthermore, while other possible suspects had remained at the scene and cooperated with police, defendant had immediately cleaned out his apartment, had not returned to work, and had left the State. Police also learned that defendant was an enforcer for a street gang, had two prior felony convictions, one for a violent crime, and had called his father from Texas indicting that he had knowledge about a gang-related triple homicide on the city's north side. The court below determined that the totality of

these facts and circumstances would justify a reasonably prudent person to believe that the defendant had committed these crimes. We find nothing manifestly erroneous in that conclusion.

Defendant next contends that his confession was the direct result of a coercive polygraph examination and should therefore be suppressed as an involuntary statement. He argues that the polygraph examiner used deception and coercion by confronting him with the test results, which, he was told, indicated that he had been "lying," and then encouraging him to tell "the truth." He further maintains that although he was given *Miranda* warnings prior to the polygraph, he was never specifically told that polygraph results would not be admissible in any subsequent proceeding. He maintains that, under the circumstances, especially considering his psychological make-up and educational limitations, he was confused and intimidated to the extent that his free will was overborne at the time he stated, "I had done it, and I'm sorry I caused you all this trouble," following the announcement of his test results.

■■■ Whether a statement is voluntarily given depends on the totality of the circumstances. The test for voluntariness is whether the statement was made freely and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606; *People v. Haymer* (1987), 154 Ill. App. 3d 760, 770, 506 N.E.2d 1378, 1385.) The question of whether a confession is a product of a free will must be answered on the facts of each case because no single fact is dispositive. (*Brown v. Illinois* (1975), 422 U.S. 590, 603, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261.) In determining whether statements were given voluntarily, the court may consider defendant's age, intelligence, background, experience, mental capacity and education, physical condition at time of questioning, duration of detention and questioning, delay in presenting defendant to a judge for a preliminary hearing, whether detention was illegal, and any physical or mental abuse by police, including the existence of threats or promises. (See *People v. Haymer* (1987), 154 Ill. App. 3d 760, 770, 506 N.E.2d 1378, 1385; *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 401, 495 N.E.2d 984, 990.) In making its decision, the trial court need not be convinced beyond a reasonable doubt, but the State has the burden of showing by a preponderance of the evidence that a statement was made without compulsion of any sort. (*Prim*, 53 Ill. 2d at 70; *Haymer*, 154 Ill. App. 3d at 770.) The finding of the trial court that a statement was voluntary will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *Haymer*, 154 Ill.

App. 3d at 770.

▉▉ Our supreme court has held that the results of a polygraph examination are not admissible in a trial court to prove either the guilt or innocence of a defendant because of serious doubts about their reliability and because of the prejudicial effect they may have on juries. (*People v. Baynes* (1981), 88 Ill. 2d 225, 240, 430 N.E.2d 1070, 1077-79; *Haymer*, 154 Ill. App. 3d at 769.) However, the mere fact that the accused confessed to a particular crime following a polygraph does not by itself render the confession inadmissible. (*Haymer*, 154 Ill. App. 3d at 772.) The polygraph examination is a form of interrogation and may be a contributing factor in inducing a statement. Therefore, this court has held that it may be given consideration, along with other factors, in determining whether a statement was coerced. *Haymer*, 154 Ill. App. 3d at 772-73.

In a number of cases, Illinois courts have held that confessions following polygraph examinations were properly suppressed. For example, in *People v. Sickley* (1983), 114 Ill. App. 3d 167, 448 N.E.2d 612, a high school guidance counselor was faced with losing his job after 18 years with a school system for allegedly taking indecent liberties with a student. Prior to his indictment on these charges, the school district arranged for him to take a polygraph test. After viewing a videotape of the tactics used by the polygraph examiner, including a 30-minute pretest interview about defendant's religious background as a devout Catholic who confessed his sins, some totally irrelevant questions about his youthful sexual behavior, an announcement that the test results "clearly" showed he "did these things" to the child, and a 20-minute harangue during which the examiner continually accused him, misrepresented his power to influence the school board's decision, used religious persuasion, and finally dictated a "letter of apology" which defendant wrote down verbatim after being discouraged from consulting the attorney in the next room, the court announced that it was "appalled" at the "psychological brainwashing" of the defendant, which rendered his statement involuntary. The appellate court agreed, that considering both the details of the interrogation and the characteristics of the accused, the confession had been induced through misrepresentation, improper influence, and duress. *Sickley*, 114 Ill. App. 3d at 172.

In *People v. Haymer* (1987), 154 Ill. App. 3d 760, 506 N.E.2d 1378, suppression of the two defendants' in-custody statements following polygraph tests was also upheld. The court pointed to defendants' illegal detention for 60 hours, physical abuse by police, including beatings while handcuffed to a wall, isolation and long periods of con-

finement, and duress as determining factors in reaching the conclusion that their statements were not voluntary. In addition, Illinois courts have long recognized the special care which should be exercised when evaluating confessions of youthful or mentally deficient individuals. (*People v. Redmon* (1984), 127 Ill. App. 3d 342, 347, 468 N.E.2d 1310, 1314.) For example, the supreme court upheld the suppression of confessions obtained from a 25-year-old defendant with an IQ of 70 as measured by a reliable standardized test. (*People v. Turner* (1973), 56 Ill. 2d 201, 306 N.E.2d 27.) After repeated *Miranda* warnings, Turner was sent to a polygraph examiner and again advised of his rights. He initially stated that he should see a lawyer, but then decided that he could wait because he would not need a lawyer until the tests were over. Told that the results indicated he had killed the victim, Turner signed two confessions later used against him. Taking his mental capacity into consideration, the court concluded that he had not knowingly and intelligently waived his rights and that therefore his confessions were not admissible. *Turner*, 56 Ill. 2d at 207; see also *People v. Redmon* (1984), 127 Ill. App. 3d 342, 468 N.E.2d 1310 (murder confession suppressed where defendant, age 17, had IQ of 70 to 73, fifth-grade reading level, and expressed confusion about meaning of "right to counsel" after rote reading of *Miranda* warnings); *People v. Simmons* (1978), 58 Ill. App. 3d 1026, 374 N.E.2d 1290 (confession of 16-year-old defendant with IQ of 80 upheld as admissible after remand, on grounds, *inter alia*, that mother and brother were present during questioning); *People v. Baker* (1973), 9 Ill. App. 3d 654, 292 N.E.2d 760 (suppression of confession upheld where 15-year-old defendant had IQ at 72).

■■ We believe that, taking all of the appropriate factors into consideration, defendant's statements following his polygraph examination were made freely and voluntarily. Defendant had been in police custody for a total of approximately six hours, including his ride from the airport, at the time he was told the results of his test and first made an inculpatory statement. Thomas Walsh, chief polygraph examiner, Chicago police department, testified that he administered the polygraph to defendant following standard procedures. Immediately prior to the test, Sergeant Schnoor told Walsh that defendant was the prime suspect in three murders, that he had been in the apartment with the victims, and that he had fled the State. Walsh, conducting the test alone with defendant in a separate room, first asked Hattery whether he had been abused in any way, whether he was on medication or drugs, and whether he was in good health. Defendant replied that he was in good health and that he had been questioned, but

"nothing along the lines of interrogation." Defendant then told Walsh what he had told the police officers about the murders. Walsh then explained the examination process and the need for defendant to sign permission forms before proceeding. Defendant told him that he could read and that he understood the forms. Along with the other *Miranda* rights, one of the forms signed by defendant includes the statement "[the examiner] has informed me that anything I say may be used against me in a court at some future time." Walsh further testified that if a suspect had been subjected to a long, intensive investigation, involving intimidation, he would not be a fit subject for a polygraph. Walsh would not have put Hattery in that category because he looked "fine." After defendant signed the forms, Walsh administered the test and interpreted the results. He told defendant that in his opinion, some of his answers had not been truthful and that he had failed the exam. He told him that it would be a good idea for him to be truthful. He did not tell defendant that Anderson or Mister had taken a polygraph or passed one. According to Walsh, defendant at all times gave appropriate answers and communicated well. He did not ask to speak to his father. As soon as Walsh had interpreted the results, defendant told him that he had not told the truth, that he was responsible for the killings, and that he wanted to speak to the investigators.

Dr. Joseph Gannon, a psychologist, testified that he had examined defendant in 1978 and again in 1979 in order to evaluate his mental fitness to stand trial in connection with other charges. He stated that he had found defendant to be clearly fit for trial and of average intelligence, although lacking certain social skills and exhibiting a tendency to be easily led by those with whom he might affiliate or feel compatible. Defendant presented no evidence relating to his IQ scores on standardized tests or to scores on tests of reading ability.

Taken as a whole, the record reveals a 21-year-old defendant of average intelligence and adequate reading skills, despite some evidence of a perceptual handicap and hyperactivity as a child, for which he had been treated. Defendant was lawfully detained by police for less than six hours before his first admission of guilt. There is no evidence whatsoever to suggest that he was physically or mentally abused at any time while in custody. He was in good health, not under the influence of any drug, and not visibly confused or emotionally upset. Furthermore, his prior experience with law enforcement procedures included two felony convictions and time in the penitentiary. He received repeated *Miranda* warnings, read and signed a waiver of rights before his polygraph, and at no time requested the presence of

the family members who had accompanied him to earlier interviews or an attorney. While defendant was not specifically informed that the polygraph results could not be admitted into evidence in a court of law, our research reveals no authority which would require Illinois law enforcement officials to provide such information prior to a polygraph examination. The *Miranda* warnings included in the written forms signed by defendant serve as a safeguard before a procedure which often includes statements made to the examiner during and following the test which are not part of the recorded test results. Briefly stated, the circumstances of abuse, illegality, mental incompetence, and egregiously improper interrogation tactics which characterize other cases where suppression was warranted are simply not applicable here. We therefore hold that the trial court's finding, that defendant's confession was not the result of a coercive polygraph, was not against the manifest weight of the evidence and will not be disturbed.

 Defendant also contends that his court-reported statements should be suppressed because they resulted from police denial of parental consultation between the time of his polygraph and his court-reported statement approximately four hours later. Defendant's father, Troy Hattery, testified that before leaving 26th and California, he knew that his son would be transported to the crime lab for a polygraph test. He told Assistant State's Attorney Owen that he wished to be present before his son's questioning resumed, and Owen agreed to telephone him. Mr. Hattery further testified that he arrived home about 4:30 or 5 p.m., and remained at home all evening, but never received the expected call. When he telephoned the police station at 9 p.m., he was told defendant was en route back to the station at that time and that the police would call him prior to any questioning. He called again at 9:30 p.m., only to be told that the car was just pulling up but questioning would not begin until another suspect had been located. He again asked to be notified and was told that the police would call. At 10:15 p.m., he called and asked for a police car to pick him up. Eventually, after another call, a car was sent. Upon arriving at the station, defendant was standing in the midst of a group of detectives and walked toward him. A police officer then told him that defendant was not leaving because he was being arrested for three counts of murder. Sergeant Schnoor testified that defendant never asked to speak to his father during questioning by Schnoor and Grogman after his return from the polygraph test. He also denied ever telling defendant that he had tried to reach his father but that Mr. Hattery was not home. He never told defendant that he would not be allowed to speak to his father until he had given a statement.

Wherever the truth may lie concerning any representations made by police to defendant's father and their alleged failure to abide by those promises, the legal result is the same. Defendant was 21 years of age at the time of his arrest and not subject to the special protections afforded juveniles in custody under the statute providing for parental notification. (Ill. Rev. Stat. 1985, ch. 37, par. 703—2.) The applicable statute in this instance is section 103—3 of the Code of Criminal Procedure (Ill. Rev. Stat. 1985, ch. 38, par. 103—3), which provides that persons arrested shall have the right to communicate with a member of the family by making a reasonable number of telephone calls within a reasonable time after arrival at the first place of custody. The purpose of this statute is to permit a person in police custody to notify his family of his whereabouts and to notify them of the nature of the offense with which he is charged so that arrangements may be made for bail, legal representation, and other procedural safeguards which a person cannot accomplish for himself while in custody. (*People v. Prim* (1972), 53 Ill. 2d 62, 69-70, 289 N.E.2d 601, 606.) This statute does not give the defendant the right to have a family member present with him during interrogation or even visit with him while in custody other than at regular visiting periods. (*Prim*, 53 Ill. 2d at 69.) The evidence in the record discloses no violation of this statutory provision. Defendant had ample opportunity to seek the help of family members, who accompanied him to his first place of custody and remained there fully available to him for one to two hours. His family members were aware of police plans to transport him to another known location for the administration of a polygraph. Defendant's father knew that, following this test, defendant would be returned to Area 6 headquarters for further questioning. He also knew that his son was under arrest or at least subject to arrest on a warrant and was voluntarily discussing a triple homicide with law enforcement officials. In contrast to a situation where a defendant is taken into custody unknown to his family and brought to a location unknown to them for interrogation, defendant's family were aware at all times of his in-custody status and his whereabouts. (See *People v. Prim* (1972), 53 Ill. 2d 62.) His family would have been able to arrange for legal counsel and to assist him in other ways contemplated by the statute. Thus, there was no isolation of defendant from his family in violation of the law. Defendant's motion to suppress his confession as involuntary on this ground was properly denied.

EXCESSIVE SENTENCES

Defendant contends that the trial court abused its discretion by

imposing three consecutive terms of natural life imprisonment. The court found that a sentence of natural life imprisonment was required by the terms of section 5—8—1 of the Uniform Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c)). The court also specifically found each of the three killings to have involved "exceptionally brutal or heinous behavior indicative of wanton cruelty" within the meaning of another provision of the statute (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b)), thereby permitting the imposition of three life sentences, one for each murder, as a matter of discretion. Finally, the court determined that, in order to protect the public from further criminal conduct by defendant, the three life terms should be served consecutively. Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(b).

 Defendant argues first that despite express language stating that if a person "is found guilty of murdering more than one victim, the court *shall* sentence the defendant to a term of natural life imprisonment" (emphasis added) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c)), interpreting this provision to require a natural life sentence places it in conflict with the preceding provision, which states that a sentencing judge *may* sentence the defendant to a term of natural life imprisonment if he finds present any of the aggravating factors listed in section 9—1(b) of the Criminal Code of 1961, including whether "the defendant has been convicted of murdering two or more individuals." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—1(a)(1)(b), 9—1(b)(3).) In a recent opinion squarely addressing this question, our supreme court held that the imposition of a natural life sentence upon a defendant convicted of two or more counts of murder, and not sentenced to death, is mandatory. (*People ex rel. Daley v. Strayhorn* (1988), 119 Ill. 2d 331, 336, 518 N.E.2d 1047, 1050.) The court reasoned that because "[the] statute unequivocally mandates natural life imprisonment for the murder of two or more persons" (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c)), and also states that "a court may not impose less than the minimum term of imprisonment set forth in the Code for certain offenses, murder being one of them" (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3(c)(2)(A)), the trial judge has no discretion to impose a sentence of less than a term of natural life in such a case. (*Strayhorn*, 119 Ill. 2d at 336.) The defendant in *Strayhorn* was convicted of three counts of murder, as was defendant in the case at bar. Accordingly, the court below properly imposed no less than one term of natural life imprisonment, as required by law.

 Defendant was sentenced to three terms of life imprison-

ment under a separate provision of the statute relating to murders characterized by "exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b).) He concedes that if this court finds that the trial judge properly found the killings "exceptionally brutal or heinous," multiple natural life sentences would stand. He nonetheless urges this court to consider whether these killings, however tragic, rise to the statutory standard of "exceptionally" brutal or heinous conduct as defined and interpreted by prior case law. We begin by stating the general rule that sentencing matters are matters of considerable judicial discretion, and provided that the sentence imposed is within statutory guidelines, reviewing courts may not reduce sentences absent a finding that the trial court abused its discretion. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492, 431 N.E.2d 344, 348; *People v. Gutierrez* (1985), 136 Ill. App. 3d 774, 790-91, 483 N.E.2d 944, 955.) While reviewing courts have the power under Supreme Court Rule 615(b)(4) to reduce sentences, the Unified Code of Corrections vests a wide discretion in trial judges in order to permit reasoned judgments as to the penalty appropriate to the particular circumstances of each case. 107 Ill. 2d R. 615(b)(4); *People v. La Pointe* (1981), 88 Ill. 2d 482, 492, 431 N.E.2d 344, 348.

In evaluating the heinousness or brutality of a defendant's conduct, the court must evaluate all of the circumstances surrounding the incident. (*People v. Buford* (1988), 178 Ill. App. 3d 329, 339, 533 N.E.2d 472, 479; *People v. Grady* (1982), 107 Ill. App. 3d 970, 977, 438 N.E.2d 608, 614.) In *People v. La Pointe*, the Illinois Supreme Court interpreted the meaning of "exceptionally brutal or heinous behavior indicative of wanton cruelty" as found in the relevant statute. The court quoted the definition of "heinous" from Webster's New International Dictionary (unabridged) as "hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal," and quoted the definition of "brutal" as including "grossly ruthless" and "devoid of mercy or compassion: cruel and cold-blooded." (*La Pointe*, 88 Ill. 2d at 501.) The court stated further that the statute clearly did not limit the imposition of a natural life sentence to only those murders involving torture or the infliction of unnecessary pain. (*La Pointe*, 88 Ill. 2d at 501.) It then affirmed the decision of the trial court sentencing to life imprisonment without parole, under this provision, an 18-year-old defendant who planned with "cold-blooded" deliberation to rob and shoot a cab driver, then shot him twice in the head from the rear at close range, turned his pockets out, took his money, and left him in his cab. The defendant also had later displayed a callous attitude and

had shown a complete lack of remorse. (*La Pointe*, 88 Ill. 2d at 501.) Similarly, in *People v. Taylor* (1987), 164 Ill. App. 3d 938, 518 N.E.2d 409, this court upheld a natural life sentence imposed upon a defendant convicted of murder and robbery, based on a finding that the murder was exceptionally brutal and heinous. We determined that the trial court had exercised proper discretion where the evidence showed that the victim was unarmed and defenseless and did not provoke defendant's behavior, yet defendant shot the victim twice at close range and exhibited no remorse for his conduct. (*Taylor*, 164 Ill. App. 3d at 944.) The record in the instant case reveals that defendant murdered a mother and her two small children in their own apartment. Acting solely upon the instructions of a street gang superior, and with no motivation or intent to rob, retaliate, or prevent discovery, defendant set his watch timer for five minutes, and at the appropriate second, announced to the unarmed woman that he now had to kill her. When she screamed and tried to defend herself, he cut her wrists and then strangled her with his hands. Then he undressed the victim, and was about to place her on a bed, when her 22-month-old son came running into the room. Defendant immediately proceeded to strangle the boy, then lift his seven-month-old sister from her crib, strangle her with his hands, and return her to the crib. He then remained in the apartment for 30 minutes, after which he walked several blocks, deposited the knife in a dumpster, borrowed plane fare at his mother's home, cleaned out his apartment, and departed for Texas. At no time following these crimes, whether in police custody or at trial, did he express remorse or regret about committing them. Defendant's claim, that he was acting under duress due to threats to his life and those of family members if he failed to carry out these acts, was brought out repeatedly at trial. Witnesses at the sentencing hearing also testified to incidents of physical abuse suffered by defendant during his childhood and to a severe disciplinary beating, or "violation," administered to defendant by other gang members, including Rufus Mister, during the week immediately preceding the murders. However, after specifically stating that he had considered the matters brought out at trial, in the presentence investigation, and "brought out both in aggravation and mitigation during the course of the death penalty hearing," the judge concluded that the acts committed by defendant were "gruesome and evil" and were done in a "cold, cruel and calculating fashion." Whether characterized as "heinous" or "brutal" as defined in *La Pointe*, these crimes clearly meet, in our opinion, the standard of "exceptionally brutal or heinous" behavior as contemplated by the statute and as interpreted and applied by our

courts. We therefore find that there was no abuse of the trial court's discretion in sentencing defendant to a term of life imprisonment for each of these crimes. Having determined that defendant was properly sentenced to three life terms under this statutory provision, we need not consider the State's contention that the defendant also qualifies for natural life imprisonment for each murder solely by reason of having been convicted of more than one murder, pursuant to section 8—1(a)(1)(c). Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c).

■■■ Defendant also maintains that the trial judge exceeded his statutory authority in imposing defendant's three life sentences to run consecutively rather than concurrently. He correctly states the established principle that consecutive sentences should be imposed sparingly. (*People v. O'Neal* (1988), 125 Ill. 2d 291, 298, 531 N.E.2d 366, 369.) Section 5—8—4(b) of the Unified Code of Corrections provides:

"(b) The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(b).)

The Illinois Supreme Court has held that this sentencing provision requires that the record show that the sentencing court is of the opinion that a consecutive term is necessary for the protection of the public. (*People v. Steppan* (1985), 105 Ill. 2d 310, 322, 473 N.E.2d 1300, 1306.) That requirement was met in defendant's case, where the trial judge explicitly determined that consecutive sentences were necessary to protect the public from a person who, already having a record of prior felony convictions, committed crimes which, in the court's opinion, were indicative of a total lack of conscience. Attempting to guard against any circumstances which might eventually bring about defendant's release from the penitentiary, the judge sentenced him to consecutive life sentences, stating that he was clearly "a candidate for complete incapacitation and removal from society, given the nature of [his] character," and that he "should not be allowed, under any conceivable circumstances, to leave the penitentiary."

Defendant contends that because one sentence of natural life imprisonment with no possibility of parole is sufficient to serve the purpose of the statute, which is to protect the public from his further criminal conduct, consecutive sentences are not supported by the statutory purpose and are excessive. However, several Illinois courts have approved the imposition of either consecutive natural life sentences or

lengthy sentences consecutive to a natural life sentence. In *People v. Bush* (1981), 103 Ill. App. 3d 5, 430 N.E.2d 514, the Appellate Court, Fifth District, held that the trial court had exercised proper discretion in sentencing the defendant to two consecutive natural life terms for murder where the court placed great emphasis on the nature of the offense and on protecting society. The defendant in *Bush* was 19 years old, had no prior felony record, and had a history of employment, but had been convicted of murdering a mother and her young son. He was sentenced to natural life terms for each of the killings under the "exceptionally heinous or brutal" provision. Similarly, in *People v. Epps* (1986), 143 Ill. App. 3d 636, 493 N.E.2d 378, the second district found that the defendant's 60-year term of imprisonment for attempted murder imposed consecutively to a term of natural life for murder was not precluded by the statutory provision for consecutive sentences where necessary for the protection of the public. The defendant in *Epps* had been convicted of murdering a mother and nearly killing her young son with a hammer. He argued on appeal, as does defendant here, that no useful purpose is served for the protection of the public by the imposition of a sentence consecutive to a natural life sentence. (*Epps*, 143 Ill. App. 3d at 643.) However, the court disagreed, finding that a sentence consecutive to a life sentence may be of consequence should the legislature, the governor, or an appellate court act under appropriate authority to modify or commute a sentence. The court also noted that "the legislature has apparently recognized that consecutive sentences serve a useful purpose, for it has provided for mandatory consecutive sentences in certain circumstances" (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—4(f), (g), (h), (i)) and has never imposed "any limitation on the length or nature of the sentence involved." (*Epps*, 143 Ill. App. 3d at 643.) We likewise note that the legislature amended section 5—8—4(a) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(a)), effective July 1988, to require consecutive sentences in additional circumstances. (Amended by Pub. Act 85—1003, §2, eff. July 1, 1988.) This amendment makes no exceptions for terms of natural life imprisonment. Finally, in *People v. Hines* (1988), 165 Ill. App. 3d 289, 307, 518 N.E.2d 1362, 1373, the fourth district, citing the reasoning of *Bush* and *Epps*, upheld defendant's sentences for robbery, aggravated criminal sexual assault, criminal sexual assault, and aggravated kidnapping to run consecutively to a natural life term for murder.

Nonetheless, defendant urges us to adopt the reasoning of the dissent in *Epps*, where Justice Hopf stated that the imposition of such consecutive life sentences serves no useful purpose, where a defend-

ant already has no prospect of future release and consequently poses no threat to society, and also that it is inappropriate for a court to "speculate as to what future legislatures, courts, or governors may do towards modifying life sentences." (*People v. Epps* (1986), 143 Ill. App. 3d 636, 645 (Hopf, J., dissenting).) However, we must decline to do so where, following the affirmation of such sentences by several courts, our legislature has not seen fit to make statutory exceptions for consecutive natural life terms and/or terms consecutive to natural life terms. Furthermore, although our supreme court has not addressed the specific issue raised here, it recently affirmed the conviction of a defendant found guilty of murdering his wife and three children in their home, where the trial court had sentenced him to four consecutive terms of natural life imprisonment. (*People v. Hendricks* (December 21, 1988), No. 63803.) While Hendricks' sentences were not directly challenged on appeal, the court affirmed the decision of the trial court, finding no reversible error. (*People v. Hendricks* (December 21, 1988), No. 63803.) Thus, where case law supports upholding defendant's consecutive sentences, and action by neither the legislature nor our supreme court precludes them, and where the express terms of the governing statute do not preclude them, we cannot find that the trial court, having met all statutory requirements, erred in sentencing defendant to three consecutive terms of natural life imprisonment.

We therefore find that the trial court did not err in denying defendant's pretrial motions and in sentencing him to an appropriate penalty within its statutory discretion. Accordingly, the decision of the trial court is affirmed.

Affirmed.

MURRAY, P.J., and LORENZ, J., concur.